**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**RODNEY HERRIS,**

Plaintiff,

v.

**ANDREW DEAN, et al.,**

Defendants.

CASE NO. 3:23 CV 1811

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending in this civil rights action is a Motion for Summary Judgment filed by Defendants Andrew Dean, Christopher Rutledge and Austin McDermott (collectively, "Defendants"). (Doc. 39). Plaintiff Rodney Herris opposes. (Doc. 42). Defendants reply. (Doc. 46). Jurisdiction is proper under 28 U.S.C. §§ 1331 & 1367. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted as to Officers Dean and Rutledge, and denied as to Officer McDermott.

## BACKGROUND

Plaintiff brought this action pursuant to 42 U.S.C. § 1983, alleging a Fourth Amendment excessive-force violation against Defendants and an Ohio state-law claim for "reckless acts and conscious disregard." (Doc. 1, at 7-8). Defendants have raised qualified immunity as to Plaintiff's federal claim and statutory immunity under Ohio Rev. Code § 2744.03(A)(6) as to Plaintiff's state-law claim. (Doc. 13, 11-12). The remaining Defendants are Andrew Dean, Christopher Rutledge and Austin McDermott, all of whom were Maumee police officers on the date in question. (Dean

Depo., Doc. 42-5, at 7-8; Rutledge Depo., Doc. 42-3, at 7-8; McDermott Depo., Doc. 42-4 at 7-8).[1]

On December 23, 2021, Defendants were dispatched to 604 River in Maumee to assist medics (Dean Depo., Doc. 42-5, at 29-30; McDermott Depo., Doc. 42-4, at 13). The medics requested police assistance after reporting Plaintiff faked a heart attack during a possible domestic dispute between Plaintiff and his partner, Renee Michel. (McDermott Depo., Doc. 42-4, at 17; Dean Depo., Doc. 42-5, at 29-30; Rutledge Depo., Doc. 42-3, at 18). The officers' response was captured on their respective body cameras. *See* Rutledge Video; Dean Video; McDermott Video; Doc. 6-2.

Defendant Rutledge was the first to arrive; he was greeted by a paramedic who told him, "he is liquored up, he comes out screaming at us saying that we don't need to be here." (Rutledge Video at 1:21-:50). When Rutledge entered the residence, Plaintiff was speaking loudly to three medics. *Id.* at 1:52. As soon as Plaintiff saw Rutledge, Plaintiff waved and said, "Come on in," before sitting on the inside stairs. *Id.* at 1:57. Michel was in a separate room when Rutledge approached Plaintiff and began questioning him about what had occurred. *Id.* at 2:04-:20.

Approximately one minute into the questioning, Plaintiff and Rutledge shook hands, and Plaintiff appeared to pull Rutledge toward him instead of releasing his grasp. *Id.* at 3:05. Rutledge warned Plaintiff stating, "don't do that," who in response raised his hands and claimed, "I was not being aggressive." *Id.* at 3:12. Plaintiff then attempted to stand from the stairs, and Rutledge used his hands to direct Plaintiff back to the stairs. *Id.* at 3:16. The contact did not appear forceful, and Plaintiff did not appear to resist sitting back down. *Id.*

1. For the depositions of the Defendants, the Court cites the internal deposition pagination rather than the ECF-generated page numbers. Dean's March 12, 2025, deposition transcript appears in the record at both Doc. 38 and Doc. 42-5. For consistency, the Court cites Doc. 42-5 throughout.

While Rutledge and Defendant Dean questioned Plaintiff in the main room, Defendant McDermott questioned Michel in another room. (McDermott Video at 1:55-4:11). McDermott asked whether there had been any physical violence between Plaintiff and Michel, and she responded, "he does not hit me." *Id.* at 2:55-:57.

Meanwhile, Plaintiff yelled to Michel from his seated position on the stairs and Rutledge instructed Plaintiff not to communicate with her. (Rutledge Video at 5:09-:14). Plaintiff responded, "I am going to do what I want," while again attempting to stand from the stairs. *Id.* at 5:15. Rutledge and Dean, who was standing behind Rutledge, instructed Plaintiff to sit back down. Rutledge again touched Plaintiff, and Plaintiff responded, "Take your hand off me, officer," as he sat back down. *Id.* at 5:20-:22. Plaintiff then yelled to Michel she needed to record Defendants' actions as she was walking with McDermott through the room to get her identification, and Dean responded, "You are on camera." *Id.* at 5:22-:25. Plaintiff stated, "Good," and stood a third time. *Id.* at 5:25-:29. Dean instructed Plaintiff to sit down, and Plaintiff responded, "I am not sitting down." (Dean Video at 3:52-:55).

Rutledge instructed Plaintiff to place his hands behind his back and Rutledge and Dean secured both of Plaintiff's arms behind his back. *Id.* As Rutledge and Dean started to handcuff Plaintiff, McDermott (who was escorting Michel to retrieve her identification) ran over to assist. (McDermott Video at 4:21). McDermott placed his arm between Plaintiff's back and left elbow in an apparent attempt to prevent Plaintiff's arm from moving. *Id.* at 4:25. All three Defendants then attempted to handcuff Plaintiff. The left handcuff was fastened, but Defendants appeared to have difficulty securing the right one. (Rutledge Video at 5:42-:48).

While being handcuffed, Plaintiff continued explaining his earlier handshake with Rutledge had been misinterpreted as aggressive. (Dean Video at 4:07-4:11). While all three Defendants were attempting to handcuff Plaintiff, Plaintiff was taken down face-first onto the

stairs he was previously sitting on. (McDermott Video at 4:41; Dean Video at 4:14; Rutledge Video at 5:50). In his deposition, Plaintiff states "one of three officers' hand pushed me in the back and pushed me into the staircase with my hands behind my back. Both hands were behind my back." (Plaintiff Depo., Doc. 37, at 84).[2] Defendants all contend McDermott initiated the takedown. (McDermott Depo., Doc. 42-4, at 47). The body-camera footage depicts all three Defendants engaged in restraining and handcuffing Plaintiff but does not clearly show which Defendant caused the takedown. (Rutledge Video at 5:29-6:20; Dean Video at 3:55-:44; McDermott Video at 4:25-5:11). Also, Defendants contend Plaintiff resisted being handcuffed, but the body-camera footage does not clearly show him physically resisting. (Rutledge Video at 5:29-6:20; Dean Video at 3:54-4:44; McDermott Video at 4:21-5:10). Plaintiff can be heard screaming during the handcuffing but does not make any verbal threats toward Defendants. *Id.*

Ultimately, Defendants secured both handcuffs while Plaintiff was on the stairs. (McDermott Video at 5:11; Dean Video at 4:44; Rutledge Video at 6:20). Plaintiff sustained an injury to his nose during the takedown, and blood is visible on the stairs as Defendants attempted to lift him. (McDermott Video at 5:14). After Plaintiff was handcuffed, medics were called back to assist. *Id.* at 5:24. Plaintiff was ultimately charged with obstructing official business, misconduct at an emergency, and assault on a medic after he was detained. *See* Doc. 6-4 (Maumee Municipal Court records); Rutledge Depo., Doc. 42-3, at 63; Plaintiff Depo., Doc. 37, at 101. He plead no contest to assault and misconduct at an emergency. (Plaintiff Depo., Doc. 37, at 105).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When

2. Citations to Plaintiff's deposition refer to the deposition transcript page numbers, not the ECF pagination.

considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials"); *see also* Fed. R. Civ. P. 56(e) (identifying a court's options when a party fails to properly support an assertion of fact).

## DISCUSSION

Defendants argue they are entitled to summary judgment on Plaintiff's Fourth Amendment excessive-force claim because there is no genuine dispute of material fact regarding whether a constitutional violation occurred. They further claim no clearly established right informed Defendants their conduct was unlawful and accordingly assert qualified immunity. Defendants

also argue they are entitled to statutory immunity on Plaintiff's state-law claim under Ohio Rev. Code § 2744.03(A)(6).

Qualified Immunity

At summary judgment, qualified immunity applies unless the evidence, viewed in the light most favorable to the plaintiff, would allow a reasonable juror to find (1) the defendant violated a constitutional right and (2) the right was clearly established at the time of the violation. *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023). At this stage, the Court may not resolve genuine disputes of material fact or make credibility determinations when determining whether an officer is entitled to qualified immunity. *See English v. Kral*, 2025 WL 2815354, at *7 (6th Cir.). When a defendant raises qualified immunity, the burden shifts to the plaintiff to overcome the defense. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).

*Fourth Amendment Excessive Force*

The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). This protection includes the right to be free from excessive force by government officials. *English*, 2025 WL 2815354, at *6. Police officers may "use some degree of physical coercion or threat thereof to effect it" when conducting an arrest or investigatory stop, but all force used must remain reasonable. *Graham*, 490 U.S. at 396. Reasonableness is assessed from the perspective of a reasonable officer on the scene rather than the 20/20 vision of hindsight. *Id.*

In determining whether the force used was reasonable, courts consider the totality of the circumstances and "pay 'careful attention to the facts and circumstances of . . . [the] case including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at

396). Courts must also account for the fact police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Before addressing whether the challenged force was objectively reasonable under *Graham*, the Court first considers each Defendant's individual participation in the alleged excessive force. Liability for each Defendant must be assessed based on his own actions. *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015). To hold an officer liable for excessive force, Plaintiff must show the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Id.* (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

In their Reply, Defendants argue Plaintiff's post-deposition affidavit should be disregarded because it contradicts his earlier sworn testimony. (Doc. 46, at 2-3). The Court considers whether the affidavit may be used in assessing each Defendant's individual participation. A party may not create a genuine dispute of material fact by submitting an affidavit that directly contradicts prior deposition testimony without a "persuasive explanation." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907-08 (6th Cir. 2006). A direct contradiction may exist where an individual was specifically questioned about a subject, stated he did not know, and later supplied those facts by affidavit. *See Johnson v. Ford Motor Co.*, 13 F.4th 493, 501-02 (6th Cir. 2021).

During his March 7, 2025 deposition, Plaintiff testified one of the three officers pushed him into the staircase, but he could not identify which officer did so. (Plaintiff Depo., Doc. 37, at 84, 87). When specifically asked whether he could identify the officer, Plaintiff responded, "No. The only thing I can . . . say for sure is Officer Rutledge was the arresting officer." *Id.* at 87. After

Defendants moved for summary judgment on September 26, 2025, Plaintiff submitted an affidavit describing what each Defendant allegedly did during the takedown:

> I did not ask Officer Rutledge to fail to, nor did I partake in Officer Rutledge failing to, place the handcuffs on me in timely manner before his teammates Dean pushed and McDermott pulled me down on the stairwell where it was readily apparent I was going to land on hard stairs face first. Because Officers Dean and McDermott caused me to be slammed into the staircase while Rutledge was holding or restraining my arms behind my back, I was unable to catch and brace myself for the impact against the steps, there causing a major laceration and fractures to my face.

(Plaintiff Aff., Doc. 42-1, at 6).

Plaintiff's affidavit directly conflicts with his earlier testimony, and he offers no explanation for how he was later able to identify what each Defendant did during the takedown. *See id.* Also, the timing of the affidavit supports disregarding it because Plaintiff submitted it more than nine months after his deposition and only four days before filing his opposition to Defendants' Motion for Summary Judgment. (Plaintiff Depo., Doc. 37, at 1; Plaintiff Aff., 42-1 at 8); *see France v. Lucas*, 836 F.3d 612, 622-24 (6th Cir. 2016) (considering the timing of a post-deposition affidavit as part of the sham-affidavit inquiry). For these reasons, the Court disregards the affidavit's identification of each Defendant's role in the force and relies on Defendant's earlier deposition.

Defendants contend McDermott decided to take Plaintiff to the stairs after they were unable to secure the second handcuff while Plaintiff was standing, while Plaintiff testified he could not identify which officer pushed him into the staircase. (Rutledge Depo., Doc. 42-3, at 66; Dean Depo., Doc. 42-5, at 42, 84; McDermott Depo., Doc. 42-4, at 90; Plaintiff Depo., Doc. 37, at 84, 87). Plaintiff's inability to identify which officer caused the takedown does not, in itself, create a factual dispute with Defendants' testimony identifying McDermott because Plaintiff must still present evidence tying each Defendant to the alleged constitutional violation. *Pineda v. Hamilton*

*Cnty.*, 977 F.3d 483, 493 (6th Cir. 2020) (requiring evidence from which a jury could find each defendant committed a constitutional violation, even where the plaintiff cannot identify which officer committed which specific act). Additionally, the body-camera footage provides no evidence tying Dean or Rutledge to the takedown. (Rutledge Video at 5:29-5:55; Dean Video at 3:54-4:15; McDermott Video at 4:21-4:42). Plaintiff therefore has not presented evidence from which a reasonable jury could find Dean or Rutledge participated in taking him down. Summary judgment is granted to Dean and Rutledge on Plaintiff's excessive-force claim.

The Court proceeds to decide whether McDermott's use of force in effectuating the takedown was objectively reasonable under *Graham*, viewing the facts in the light most favorable to Plaintiff.

**Severity of the Crime**

The first *Graham* factor in assessing the reasonableness of force employed considers the severity of the crime at issue. *Graham*, 490 U.S. at 396. "Conduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors." *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019); *see also English,* 2025 WL 2815354, at *9 (explaining the governmental interest is "relatively weak" where the suspected crimes are minor).

The officers were initially called to Plaintiff's residence to investigate a possible domestic dispute. (McDermott Depo., Doc. 42-4, at 13, 17). By the time of the arrest, the investigation into whether domestic violence had occurred was incomplete. (Rutledge Depo., Doc. 42-3, at 34; Dean Depo., Dean Depo., Doc. 42-5, at 23). McDermott (who was in the other room with Michel) testified he did not know why Plaintiff was being arrested when he joined the others in handcuffing Plaintiff. (McDermott Depo., Doc. 42-4, at 31-32). However, McDermott knew Michel had denied any physical violence between herself and Plaintiff. *Id.* at 21. Dean stated Defendants had not yet determined what offense had occurred before Plaintiff's arrest but believed Plaintiff's conduct at

the time amounted to obstruction. (Dean Depo., Doc. 42-5, at 26). Rutledge characterized the offenses at the time of arrest as "misdemeanor-level" obstructing official business and misconduct at an emergency. (Rutledge Depo., Doc. 42-3, at 42-43, 58-59). Plaintiff was ultimately charged with obstructing official business and misconduct at an emergency.[3]

These circumstances differ from cases where officers encountered clear evidence of violent domestic conduct and the first *Graham* factor weighed in their favor. *See Franke v. Janes*, 168 F.4th 797, 806-07 (6th Cir. 2026) (finding the severity factor favored the officer where the victim had visible red marks on her neck, reported the plaintiff had pushed her, and described prior domestic violence along with violent threats); *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609-10 (6th Cir. 2020) (finding the offense severe where officers responding to a domestic-violence call and encountered what appeared to be a potentially deadly assault). By contrast, the Sixth Circuit has treated nonviolent obstruction as relatively minor. *See Reed v. Campbell County*, 80 F.4th 734, 748 (6th Cir. 2023) (describing suspected obstruction as an offense of "minimal" severity); *Jackson-Gibson v. Beasley*, 118 F.4th 848, 854-55 (6th Cir. 2024) (concluding resisting or obstructing was not severe where a reasonable jury could find the conduct was nonviolent). In summary, the first *Graham* factor does not favor either side. Although Defendants were still investigating whether the reported dispute involved domestic violence, they had not identified any physical violence at the scene, and the offenses identified at the time of arrest were relatively minor.

**Threat to Safety**

The second *Graham* factor asks whether Plaintiff posed an immediate threat to the officers or others. *Graham*, 490 U.S. at 396. The question is whether a reasonable officer at the scene

---

3. Since the assault charge arose from Plaintiff kicking a medic after the takedown it does not bear weight on the severity of the offense analysis. (Dean Depo., Doc. 42-5, at 62).

would have viewed Plaintiff as an immediate safety threat justifying the force used. *See Kent*, 810 F.3d at 390-91.

The body-camera footage depicts Plaintiff speaking loudly, at times yelling, but not verbally threatening Defendants or Michel. (Rutledge Video at 1:52-5:29). He remained seated for most of the encounter, briefly pulled Rutledge toward him during a handshake approximately two minutes and forty-five seconds before the takedown, and attempted to stand three times. *Id.* at 3:05, 3:16, 5:15-5:22, 5:25-:29; Dean Video at 3:52-3:55. Nothing indicates that any Defendant observed Plaintiff with a weapon, and Michel told McDermott there had been no physical violence between herself and Plaintiff. (Dean Depo., Doc. 42-5, at 60-61; Rutledge Depo., Doc. 42-3, at 75-76, 111; McDermott Depo., Doc. 42-4, at 21, 68). By the time Defendants began handcuffing Plaintiff, his hands were behind his back. (Rutledge Video at 5:29-:42). Viewed in the light most favorable to Plaintiff, these circumstances do not reflect the type of violent or threatening conduct sufficient to establish an immediate threat. *See Kent*, 810 F.3d at 390-91 (distinguishing agitated gestures from violent thrashing, attempts to strike officers, or displays of force); *Shumate v. City of Adrian*, 44 F.4th 427, 443-44 (6th Cir. 2022) (finding at most a minimal threat where the plaintiff was rude and uncooperative but made no threats or display of force). For these reasons, a reasonable jury could find Plaintiff did not pose an immediate threat to the officers or others, making the second *Graham* factor weigh against reasonableness.

**Resistance**

The Sixth Circuit distinguishes active resistance from mere noncompliance or passive resistance. Active resistance requires "some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance." *Shumate*, 44 F.4th at 445 (6th Cir. 2022) (quoting *Eldridge v. City of Warren*, 533 F. App’x 529, 534 (6th Cir. 2013)). By contrast, passive resistance generally involves a lack of physical resistance or verbal

antagonism. *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017). "Noncompliance alone does not indicate active resistance; there must be something more." *Eldridge*, 533 F. App'x at 535.

Whether or not Plaintiff actively resisted the arrest is disputed. Defendants claim Plaintiff tensed, pulled, or positioned his arms in a manner interfering with securing the second handcuff. (Dean Depo., Doc. 42-5, at 37-40; McDermott Depo., Doc. 42-4, at 41-42; Rutledge Depo., Doc. 42-3, at 60-61, 91-93). Plaintiff asserts he was complying, attempting to remain still, and never resisted. (Plaintiff Depo., Doc. 37, at 82-83, 87-88) The body-camera footage shows Plaintiff standing with his hands behind his back as Defendants attempted to handcuff him. (Rutledge Video at 5:29-:42). What is clear is one handcuff was secured while Defendants attempted to secure the second. *Id.* at 5:42-:48. But the videos do not make clear whether Plaintiff pulled away, tensed, or physically struggled in the manner Defendants describe. (Rutledge Video at 5:29-6:20; Dean Video at 3:54-4:44; McDermott Video at 4:21-5:10). A reasonable jury could credit Defendants' testimony and find Plaintiff physically resisted their efforts to secure the second handcuff. Or a reasonable jury could credit Plaintiff's testimony and find he remained still and did not resist while Defendants attempted to handcuff him.

Since the footage does not "blatantly contradict[]" Plaintiff's account, the Court must view the disputed handcuffing and resistance in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *English*, 2025 WL 2815354, at *7. Plaintiff's refusal to remain seated and statement he was "going to do what I want" demonstrate mere noncompliance. (Rutledge Video at 5:15-:22). However, noncompliance alone does not constitute active resistance. *See Eldridge*, 533 F. App'x at 535; *Shumate*, 44 F.4th at 445-46. Plaintiff's version of the events is closer to passive resistance rather than the "volitional and conscious defiance" required for active resistance. *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1006-07 (6th Cir. 2024) (explaining failure to present one's hands or

slight arm movement during handcuffing may constitute passive resistance); *Shumate*, 44 F.4th at 447-48 (concluding pulling arms away, without other acts of defiance, did not amount to active resistance). Accordingly, a jury could find Plaintiff was passively resisting and therefore, the third *Graham* factor weighs against reasonableness.

**Totality of the Circumstances**

The *Graham* factors guide the analysis, but the ultimate question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The inquiry is not limited to the moment force was used but includes relevant events leading up to it. *See Barnes v. Felix*, 605 U.S. 73, 80-82 (2025). The Court must balance "the nature and quality of the intrusion" on Plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396.

For the reasons discussed above under the *Graham* factors, the circumstances presented some governmental interest in using force (the severity-of-the-crime factor being neutral), but a reasonable jury could find they did not justify the takedown. Prior to the takedown, Plaintiff was speaking loudly and at times yelling, without ever threatening Defendants. (Rutledge Video at 1:52-5:29). The officers were investigating a possible domestic dispute and, at the time of the arrest, obstruction-related conduct. (McDermott Depo., Doc. 42-4, at 13-14, 17; Dean Depo., Doc. 42-5, at 61-63; Rutledge Depo., Doc. 42-3, at 42-43, 58-59). Viewing the record in Plaintiff's favor, he was not actively resisting when McDermott took him face-first onto the staircase with one wrist handcuffed and his other arm held behind his back. (Plaintiff Depo., Doc. 37, at 82-84, 87-88; Rutledge Video at 5:29-6:20; Dean Video at 3:54-4:44; McDermott Video at 4:21-5:10). Hence, considering the totality of the circumstances, a reasonable jury could find the takedown objectively unreasonable. These factual disputes prevent the Court from determining as a matter of law that no constitutional violation occurred.

*Clearly Established Right*

Even where the evidence would permit a reasonable jury to find a constitutional violation, Plaintiff must also show the right allegedly violated was clearly established on December 23, 2021—the date on which Defendants used force against Plaintiff. *See T.S.*, 742 F.3d at 635. Once Defendants raise qualified immunity, Plaintiff bears the burden of showing the right was sufficiently clear such that "every reasonable official would have understood that what he [was] doing violate[d] that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Unless the violation is obvious, the plaintiff ordinarily must identify sufficiently similar precedent placing the constitutional question beyond debate. *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022).

Plaintiff relies on *English*, 2025 WL 2815354, and notes *English*'s reliance on *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681 (6th Cir. 2006). (Doc. 42, at 17). Plaintiff also relies on *Morrison v. Board of Trustees of Green Township*, 583 F.3d 394 (6th Cir. 2009). (Doc. 42, at 17-18). Because *English* postdates December 2021, it cannot clearly establish the contours of the Fourth Amendment right. Therefore, the Court considers *Shreve* and *Morrison* because they are preexisting cases identified in Plaintiff's argument.

*Shreve* held clearly established law prohibits gratuitous force against an individual who poses no safety risk, even before handcuffing was complete. 453 F.3d at 687-88. *Morrison* held it was "obvious" an officer could not push a handcuffed, non-threatening individual's face into the ground. 583 F.3d at 408. Defendants distinguish these cases based on the type of force used and whether the plaintiff had already been fully handcuffed. (Doc. 46, at 10-11). But "whether a suspect was handcuffed when officers applied force has not been a decisive consideration in our determination of whether a suspect's freedom from excessive force was clearly established." *Malory v. Whiting*, 489 F. App'x 78, 85 (6th Cir. 2012) ("The question of whether a 'clearly

established legal norm' prohibited Defendants' conduct does not turn on the technicality of whether Plaintiff was handcuffed.") (quoting *Harris v. City of Circleville*, 583 F.3d 356, 357 (6th Cir. 2009)).

Resolving the factual disputes in Plaintiff's favor, a reasonable jury could find he posed no immediate threat, was not actively resisting, had one wrist handcuffed, and had his other arm held behind his back when McDermott took him face-first onto the staircase. Those facts are close to *Shreve*, where the force was used against a non-threatening individual before handcuffing was complete, and *Morrison*, where the court held an officer could not push a restrained, non-threatening individual's face into the ground. On the record before the Court and viewing all facts in the light most favorable to Plaintiff, *Shreve* and *Morrison* gave McDermott fair notice that the challenged force was unlawful. McDermott is not entitled to qualified immunity at this stage.

<u>State-Law Statutory Immunity</u>

Defendants also assert statutory immunity under Ohio Rev. Code § 2744.03(A)(6). (Doc. 39-1, at 19-20). Immunity does not apply where an employee acts "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Reckless conduct involves a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Downard ex rel. Downward v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (quoting *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2012)).

When federal qualified immunity and Ohio statutory immunity under § 2744.03(A)(6) rest on the same questions of material fact, the Court may review the state-law immunity defense "through the lens of the federal qualified immunity analysis." *Id.* 602-03. For the same reasons discussed above, no reasonable jury could find Dean or Rutledge acted recklessly in connection with the takedown, and they are correspondingly also entitled to immunity and summary judgment

on Plaintiff's state-law claim. However, the same factual disputes cited above preventing a finding of qualified immunity as to McDermott's actions at this stage also prevent a finding that he is entitled to state law immunity.[4]

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 39) be, and the same hereby is, GRANTED IN PART and DENIED IN PART as set forth herein. Specifically, the Motion is granted as to Officers Dean and Rutledge and denied as to Officer McDermott; and it is

FURTHER ORDERED that Defendants' Motion to Exclude Plaintiff's Expert Testimony (Doc. 45) be, and the same hereby is, DENIED AS PREMATURE, WITHOUT PREJUDICE.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2026

4. Concurrently with their Reply (Doc. 46), Defendants filed a Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Christopher Gill. (Doc. 45). Therein, Defendants contend Gill's opinions and testimony should be excluded from consideration both at the summary judgment stage and at trial. *See* Doc. 45, at 2. As set forth herein, the Court finds McDermott is not entitled to summary judgment and Plaintiff is entitled to proceed without reference to Gill's report or testimony. The Court therefore denies Defendants' Motion to Exclude (Doc. 45) as premature at this time. This denial is without prejudice to refiling such a motion prior to trial.